IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| RUSSELL MIDKIFF, ROBERT MILAM AND TIMOTHY MURPHY, | ) ) ) | |
| Plaintiffs, | ) | No. _____ |
| | ) | |
| vs. | ) | |
| | ) | JURY TRIAL DEMANDED |
| THE BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA | ) ) ) | |
| | ) | |

## CIVIL COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

This Civil Complaint for Damages and Injunctive Relief is filed against

Defendant Board of Regents of the University System of Georgia for violating the

Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 704, and

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000(e), et seq.

### Nature of The Case

1.     This lawsuit is brought by three law enforcement officers employed by

University System of Georgia in the Special Tactics Unit of the Kennesaw State

University ("KSU") Department of Public Safety (also "the Department"). This

complaint alleges that these officers were subjected to retaliation by the Defendant

in violation of the Rehabilitation Act of 1973 and Title VII of the Civil Rights Act

of 1964.  The retaliation against Captain Timothy Murphy, the KSU Special

Operations Unit Commander and Lieutenant Robert Milam, his second-in-

command, arises out of the transfer and promotion of Corporal Russell Midkiff to

their Unit in settlement of Midkiff's  internal discrimination complaint alleging non-

selection for promotion.  The Captain and Lieutenant opposed retaliation by the

Chief and Deputy Chief of the Department who did not agree with the settlement

and directed his new Unit to subject him to extreme scrutiny.  Because of their

opposition, the Captain and Lieutenant were made subjects of a secret investigation

and issued formal Disciplinary Final Warnings based upon contrived and false

charges. Corporal Midkiff alleges that he was subjected to unlawful retaliation and

discrimination, lost wages, and was required to choose between termination and

submitting to an unlawful mental examination.  The Plaintiffs seek damages and

injunction relief requiring the Defendant to cleanse their employment and other

university records of derogatory information identified to them as the result of the

unlawful retaliation.

## II.  Parties

2.     Defendant Board of Regents of the University System of Georgia

("Defendant" or "Board of Regents") administers all public universities in the State

of Georgia, including Kennesaw State University (KSU).

3.     Plaintiff Russell Midkiff is a law enforcement officer with the KSU Department of Public Safety.   Midkiff holds the rank of Corporal assigned to the Special Operations Unit.  He has served five years in the Department.  He has bachelor's and Master's of Science degrees conferred by KSU. He was served in the Georgia National Guard and deployed twice to Afghanistan where he incurred service-related disabilities. He is 53 years old and a resident of the State of Georgia.

4.     Plaintiff Robert Milam is a law enforcement officer with the Department. Milam holds the rank of Lieutenant and is second in command in the Special Operations Unit.  He has served 15 years in the Department.  Lieutenant Milam is 41 years old and is a resident of the State of Georgia.

5.     Plaintiff Timothy Murphy is a law enforcement officer with the Department. Murphy holds the rank of Captain and is Commander of the Special Operations Unit.  He has served 24 years with the Department.  CPT Murphy is 48 years old and is a resident of the State of Georgia.

### III.   Jurisdiction and Venue

6.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this case arises under Section 504 of the Rehabilitation Act of 1973,  29 U.S.C. §704, and  Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000(e), et seq.

7.      Venue in the Northern District of Georgia  proper under 28 U.S.C. § 1391 (b) (1) & (2) because all actions complained of occurred within the boundaries of this judicial district and the Defendant resides within this district.

8.      All conditions precedent to the institution of this lawsuit and maintenance of the claims asserted herein have been satisfied.

9.      All claims asserted herein have been made within the applicable statutes of limitation.

10.     The University System of Georgia accepts federal assistance through Department of Education programs, thus waiving the Eleventh Amendment proscription of bringing an action for alleged violation of Section 504 of the Rehabilitation Act of 1973 against a state in federal court.

11.     The Eleventh Amendment proscription against suing states in federal courts has been abrogated with respect to claims asserted pursuant to Title VII of the Civil Rights Act of 1964, 29 U.S.C. § 2000e et seq.

12.     Plaintiffs each filed one or more timely Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC").  Plaintiffs requested and received Notices of Right to Sue issued by the United States Department of Justice. True and accurate copies of which are attached as Exhibit B.

## IV.   Factual Allegations Underlying  Plaintiffs' Claims

13.    Corporal Midkiff has a Bachelor of Science degree in integrative studies conferred by KSU in December 2015.  He has a Master of Science degree in international policy management conferred by KSU in May 2018.

14.    Corporal Midkiff has multiple serviced-related disability ratings as the result of his military service and deployments to Afghanistan.  Midkiff continues to receive treatment through the Veteran's Administration.

15.    At all relevant times, the fact of Midkiff's service-related disability was known to Chief Stephens, Deputy Chief Vaughn, and the other Department cadre.

16.    Corporal Midkiff submitted a claim of discrimination to the KSU Office of Institutional Equity (OIE) in August 2018. The OIE is responsible for ensuring that KSU complies with all applicable laws and policies regarding discrimination including  disability.

17.    Corporal Midkiff claimed that he was denied a promotion to K9 Handler position in the Special Operations Unit.  The Special Operations Unit ("Unit") is responsible the Department's K9 activities, Honor Guard, and Special Events.

18.    The OIE investigated the potential veteran status, disability, and age discrimination.  Concerns regarding Midkiff's deployment status were not an issue in 2019 as his retirement from the Guard was being processed.

19.    Nine months later, in April 2019, the OIE approached Corporal Midkiff with a proposed informal settlement of his claim. The Agreement had Midkiff releasing all claims, liabilities rights and actions against anyone associated with KSU and giving up any right of appeal.  In return, the Chief agreed to promote Midkiff to corporal in the Special Operations Unit and offer him a K9 Handler position if one became available within the next two years.

20.    On May 9, 2019, the Chief, Midkiff and the then-Executive Director of Institutional Equity and Title IX Coordinator each signed the  Agreement.  A copy of the Informal Resolution Agreement and General Release of All Claims (Informal Resolution Agreement) is attached as Exhibit B.

21.    At the time that the Chief signed the Agreement, the Chief and Deputy Chief intended to undermine it and deprive Corporal Midkiff of the value of the transfer and promotion.

22.    The same day that the Chief signed the Agreement (May 9, 2019), the Chief and Deputy Chief called a meeting with Special Operations Unit.  Prior to the meeting the Chief and Deputy Chief discussed what the Chief would tell them.

23.    At the meeting, the Chief told the Unit that he and the Deputy did not agree with the Midkiff promotion and were told to do it. The Chief made clear to the Unit that he wanted them to subject Midkiff to extreme scrutiny and document anything

he did wrong.  The clear tenor and intent of the meeting was one of retaliation against Midkiff.  The purpose and effect were to cause animosity against Midkiff, make the environment of his new duty assignment hostile and to set him up for failure.

24.     A few days later, the Chief privately told Captain Murphy not to request a K9 for the next two years.

25.     An officer in the Special Operations Unit who was upset by the Chief and Deputy Chief's announcement used the Open Records Act to obtain documents regarding the OIE investigation and resolution of the Midkiff complaint.  The production included a copy of the Informal Resolution Agreement Chief's which proved that in fact had agreed in writing to the resolution which he denounced during the May 9 indicating to members of the Unit that he and the Deputy Chief were not truthful during the meeting.

26.     The KSU Office of Institutional Equity (OIE) investigates all complaints of discrimination and/or harassment except for sexual misconduct complaints against students.  No other Department outside the Department of Public Safety is authorized to investigate complaints of harassment and discrimination against KSU law enforcement officers.

27.    The OIE's investigation process requires notifying subjects of a complaint the nature of allegations against them.

28.    The KSU Department of Public Safety has specific policies and procedures governing the conduct of its officers and investigation of complaints against its officers and civilian employees.  General Order Number 203 (GO 203), Internal Affairs Complaint Investigations, sets forth the process and procedure for investigating all allegations of misconduct from any source received from any source outside or inside the Department, no exceptions.

29.    Under GO 203, subjects of a complaint are notified in writing.  The notification includes a statement of the allegations and their rights and responsibilities relative to the investigation. The subjects have the right to have an attorney present during an interview.  The subjects are provided a copy of the investigative report.

30.    The KSU Human Resource Department (KSU HR) does not investigate complaints, code of conduct or other alleged policy violations by Department officers.

31.    The KSU Internal Audit Department provides independent, objective audits and consulting services designed to add value and improve KSU's operations. The

Internal Audit Department Charter does not authorize the investigation of alleged code of conduct violations against Department officers.

32.    An OIE complaint does not take the place of nor delay action by the Department of Public Safety regarding conduct by officers which violates a General Order.

33.    On or about June 6 , 2019, the Department evidence custodian overheard a sentence uttered by Midkiff in conversation with other officers which she stated was offensive.  In direct contravention of GO 203, the 'complaint' was not processed by the Department but was instead sent to an HR Employee to investigate.  The HR Employee attempted to keep her investigation hidden by advising witnesses whom she interviewed to reveal to no one what she was doing.   One witness was Corporal Midkiff's supervisor, Lieutenant Milam.

34.    The HR Employee had no authority to direct Lieutenant Milam to keep from his chain of command her investigation.

35.    On Monday, June 10, 2019, consistent with General Order 201 V.1.g. Lieutenant Milam reported to Captain Murphy that he heard that the HR Employee was investigating a member of their unit, Corporal Midkiff.

36.    GO 201 V.1.g. provides:

As appropriate, disciplinary action may be taken for any of the following reasons: . . . . g. Failure to report to an appropriate superior authority incompetence, misconduct, inefficiency, neglect of duty, moral turpitude, or any other form of misconduct or negligence of which the employee has knowledge.

37.    Lieutenant Milam was required to report the alleged violation.

38.    On June 10 or 11, 2019, Captain Murphy reported to the Chief the report he received from Lieutenant Milam. Captain Murphy was required to report the alleged violation.

39.    On June 13, 2013 Corporal Midkiff reported to OIE that he had been told about the directions given by the Chief and Deputy Chief during the May 9, 2019 meeting with his Unit and later to Captain Murphy and the problems it caused for him in his Unit and the Department.

40.    The HR Employee concluded her investigation of Corporal Midkiff on June 13, 2019.

41.    On June 18, 2019, a KSU OIE investigator interviewed the Chief and Deputy Chief regarding the May 9 meeting making them aware that OIE was investigating the matter. That same day the HR Employee met with the Deputy Chief.

42.    On June 19, 2019, Lieutenant Milam contacted the OIE to provide information concerning the retaliation against Midkiff.

43.    On June 24, 2019, the HR Employee re-interviewed Lieutenant Milam under the pretense that she had more questions regarding the investigation but questioned him only about what he reported to Captain Murphy.  Her purpose was to show that Lieutenant Milam disclosed her investigation which then could be made a charge against him.

44.    On June 26, 2019, Captain Murphy met with the OIE investigator and reported that the Chief and Deputy Chief falsely reported that they did not agree to the Midkiff promotion so that the Unit would pressure on Midkiff, the Chief told him not to request a bomb dog, the Chief and Deputy Chief emphasized writing Midkiff up for any infraction, they had HR conduct a "witch-hunt" investigation when any other issue would be handled internally, and the Deputy Chief was putting pressure on him and his Unit because they would not put pressure on Corporal Midkiff.

45.    On July 2, 2019, the HR Employee re-interviewed Captain Murphy under the pretense that she had more questions regarding the investigation but questioned him only about what Lieutenant Milam reported to him and what he reported to the

Chief.  Her purpose was to develop evidence to be used against Captain Murphy and charge him with a violation.

46.    If Lieutenant Milam and Captain Murphy were suspected or accused of a code-of-conduct violation, GO 203 required that the matter it be investigated by the Department and that each be advised of the charge and provided an opportunity to make an informed response and present evidence.

47.    The investigation by the HR Employee proceeded with the Deputy Chief's involvement and with the Deputy Chief and Chief's approval.  On information and belief, this is the first time that GO 203 had been circumvented in this manner.

48.    The HR Employee prepared a final report regarding her investigation of the Corporal Midkiff comment and her investigation of Captain Murphy and Lieutenant Milam ("HR Report").  The HR Report was never revealed to, nor was a copy ever provided by KSU to Captain Murphy or Lieutenant Milam.

49.    The Chief and Deputy Chief did not reveal to, or address with Captain Milam and Lieutenant Milam the HR Employee's secret investigation of them, never engaged the Department's procedures as required by GO 203, and five months later when directed to do so, on November 20, 2019 the Chief issued to Captain Murphy and Lieutenant Milam disciplinary final warnings (Disciplinary Final Warnings).

50.    The Disciplinary Final Warnings were issued to Captain Murphy and Lieutenant Milam because they opposed the retaliation against Corporal Midkiff.

51.    The Informal Settlement Agreement resolving Corporal Midkiff's discrimination claim required that KSU's OIE would monitor, track, and enforce the terms and conditions of the Agreement.  Instead, the KSU Chief Institutional Auditor was assigned to take over the investigation.  The new investigation would later be characterized as an internal audit of the Public Safety Department.

52.    On July 2, 2019, KSU's Chief Institutional Auditor met with Corporal Midkiff.  Among the things which he explained to her was that the stress from the retaliation by the Chief and Deputy Chief triggered his Post Traumatic Stress Disorder making it difficult for him to sleep.  He explained that he had taken leave because he would not report to work in a sleep-deprived state and per Department policy could not carry his service pistol.  When the Chief Institutional Auditor told him that she was going on a two-week vacation and could not do anything until she returned, Midkiff told her he needed something done because he would run out of leave and they did not want him handling a gun at that time.

53.    The Chief Institutional Auditor brought the issue to the Chief Legal Advisor who in turn contacted Chief Stephens to address how they would handle Midkiff.  The decision was made to place Midkiff on administrative leave.  Based upon his

statement that "you do not want me to have a gun right now" in conjunction with his discussion of his sleep-deprivation caused by his PTSD, they determined that Corporal Midkiff was a risk to the safety to himself and those in the community.

54.   Corporal Midkiff was banned from the KSU campus and the use of its services.

55.   Captain Murphy and Lieutenant Milam were threatened by the Chief and Deputy Chief with termination if they mentioned to anyone why Corporal Midkiff was suddenly absent.

56.   On July 31, 2019, the Chief Institutional Auditor and the Assistant V.P. Human Resources spoke with Corporal Midkiff to explain her findings which characterized the May 9 meeting as a misunderstanding and poor communication. Corporal Midkiff objected to Chief Institutional Auditor's conclusions which he perceived as a 'whitewash' of the Chief and Deputy Chief's conduct.

57.   Midkiff emailed an Open Records Act request. Human Resources directed IT to terminate Midkiff's email access, something reportedly unheard of for a current employee.

58.   Two months later, the Chief Institutional Officer issued a report which rendered findings absolving the Chief and Deputy Chief of any wrongdoing and making findings that that Captain Murphy and Lieutenant Milam violated policy by

reporting that the HR Employee was investigating the Midkiff comment and then by being untruthful when they said that they did not discuss the details of her investigation. Captain Murphy and Lieutenant Milam had no way of knowing the 'details' of the HR Employee investigation because neither had spoken with the HR Employee before they made their reports.

59.     Captain Murphy and Lieutenant Milam learned for the first time that they were subjects of an investigation when the Chief Internal Auditor at the end of September 2019 called them in to tell them her findings.

60.     KSU and The University System of Georgia provide no process, procedure or right to challenge the findings in the Chief Institutional Audit Report. Corporal Midkiff attempted to appeal the Report's findings to the OIE but was told that under circumstances they could not investigate it.

61.     In October, following the issuance of the Chief Institutional Auditor's Report, the Asst. V.P. of Human Resources notified Corporal Midkiff to return to work after first taking a psychological fitness for duty examination. The Chief Legal Affairs Officer told him that she, the Asst. V.P. Human Resources and Chief Financial Officer required the examination based upon his comment on July 2.

62.     The  Regulations implementing the employment provisions of Title I of the American's With Disabilities Act apply to all non-affirmative action employment

discrimination claims of individuals with disabilities under Section 504 of The Rehabilitation Act of 1973, as amended. The Regulations permit mental examinations of current employees only if they are job-related and consistent with business necessity.

63.    The psychological fitness for duty examination is a medical examination subject to the requirement that it be job-related and a business necessity.

64.    Requiring a fitness for duty for Department officers is governed by GO 201 V.D.1.c.  which provides:

> **Mental unfitness for the position which the employee holds:** the Chief of Police shall have the right to require any officer to report to a State of Georgia licensed psychiatrist or psychologist for examination, testing or counseling when, in the opinion of the Chief, the behavior of the officer has raised the issue of whether or not the officer is in satisfactory mental health to perform the duties assigned. This is a 'psychological fitness for duty evaluation.' The psychiatrist or psychologist shall be selected or approved by the Chief and the Department shall pay for the initial consultation and evaluation.

65.   Midkiff informed the Chief Legal Affairs Officer of his concern that having on his record that he was required to take a mental fitness for duty examination associated with workplace violence would have a negative impact upon future employment opportunities. He pointed out under General Order 201 only the Chief was authorized to require a psychological fitness for duty examination if in his opinion the behavior of the officer has raised the issue of whether or not the officer is in satisfactory mental health to perform the duties assigned.  He explained that the examination was not something which the Chief would be expected to require based upon past practice.   The requirement remained.

66.   To avoid the negative impact Corporal Midkiff arranged at his own expense for a voluntary examination by a well-regarded psychologist, called upon to perform assessments in pending court cases and known for his expertise with fitness for duty examinations of law enforcement officers.   This psychologist examined and tested Midkiff and prepared a report which reflected his determination that there is no evidence within his evaluation to suggest that Corporal Midkiff  was a danger to himself or others.  The Defendant refused to consider his report.

67.    By excluding Chief Stephens from the process, the Chief of Legal Affairs Officer and Asst. VP. of Human Resources acted in contravention of GO 201 V.D.1.c.

68.    The Chief of Legal Affairs Officer and Asst. VP. of Human Resources failed to make the inquiries and determinations which are conditions precedent to requiring submission to a mental examination.  The Defendant demonstrated no business necessity for requiring Midkiff to take the psychological examination on threat of discharge.

69.     On December 17, 2019, the Deputy Chief was directed to issue a letter of reprimand to Corporal Midkiff based upon the comment made over six months earlier.

70.    The Board of Regents delegates to the president of each member institution the authority and responsibility to manage the institution to which they are assigned.

71.    The Board of Regents authorizes the institution president to delegate his or her authority and responsibilities.

72.     At all relevant times, acting within their scope of their employment and exercising the actual or implied authority delegated to them by the Defendant were: Pamela S. Whitten serving as the President of KSU,  Nwakaego Nkumeh as Vice President and Chief Legal Affairs Officer,  Karen McDonnell as  Assistant Vice

President of Human Resources,  Edward Stephens as Chief of the KSU Department of Public Safety, and Trudi Vaughan as Deputy Chief of Police.

73.     The HR Employee and Chief Internal Auditor were acting on behalf of, or the direction of the one of more employees named in the preceding paragraph.

74.     The Board of Regents publishes guidelines, policies and rules designed to foster compliance with ethical standards and federal and state law.  The Board pushes down responsibility for maintaining these standards to individual institutions expecting them to police themselves.

75.     Board policy permits discretionary review of institution decisions which are 'final' and 'limited to instances in which an employee is terminated, demoted, or otherwise disciplined in a manner that results in a loss of pay'.

76.     None of the findings in the investigations, claims of retaliation, disciplinary actions, and the requirement that Midkiff take the mental examination or be discharged are subject to Board review regardless of final action.

77.     On November 19, 2019, Corporal Midkiff sent to the USG Director or Ethics and Compliance a detailed explanation of the mental examination and retaliation issues at KSU and requested his guidance and assistance.  He was told to follow the direction of the KSU Office of Legal Affairs and to use the discretionary review.

78.     Corporal Midkiff requested an opportunity to meet with President Whitten to express his concerns.  That request was denied.

79.     Corporal Midkiff proposed an upstream means to resolve the ongoing dispute through mediation.  Mediation services are available at cost no cost to KSU.  KSU has a Masters-level and Doctoral Conflict Management Program which is ranked fifth among all such graduate programs nationally, with professors who are highly regarded nationally and internationally for their dispute resolution skills.  Corporal Midkiff received no response to that proposal.

80.     Because of the Board of Regents broad delegation of authority to the KSU President and the lack of oversight of unlawful actions and violation of Board policy, the Board of Regents is liable for the violations set forth herein.

## COUNT ONE
### Violation of the Rehabilitation Act
### Injunctive Relief and Damages (Captain Murphy)

81.     The Rehabilitation Act of 1973 and Title VII of the Civil Rights Act of 1964 ("Acts") make it unlawful for an employer to retaliate against an employee because he has opposed an employment practice which violates the Act.

82.     Captain Murphy had a good faith belief that the directive received from the Chief and Deputy Chief on May 9, 2019, and the direction by the Chief not to request a K9 were unlawful retaliation against Corporal Midkiff.

83.    Captain Murphy had a good faith belief that the investigation of Corporal Midkiff in contravention of Department GO 203 proceeded with the Chief and Deputy's Chief approval and was motivated by their expressed intent to make Corporal Midkiff's work environment difficult and subject Midkiff to heightened scrutiny.

84.    Captain Murphy's report to OIE constituted protected activity under the Acts.

85.    By not following the directive of the Chief and Deputy Chief, Captain Murphy engaged in protected oppositional activity under the Acts.

86.    The Defendant's investigation by the HR Employee targeting Captain Murphy, crafting contrived and false charges against Captain Murphy, and issuing a Final Written Warning to Captain Murphy is retaliation made unlawful by the Acts.

87.    The Disciplinary Final Warning constitutes a substantial and serious stain on Captain Murphy's employment record damaging and eliminating opportunities for advancement, pay increases and job assignments.  The purpose and effect of the Final Written Warning is to position Captain Murphy at risk of discharge at the Defendant's discretion should he commit a minor infraction going forward.  The Disciplinary  Written Warning impairs Captain Murphy's marketability should he seek employment outside the KSU Department of Public Safety.

88.    The Defendant is liable to Captain Murphy for damages resulting from the retaliation including the emotional distress inflicted by damaging his 24-year record of service to KSU.

89.    The Defendant should be required to remove from Captain Murphy's personnel records the Disciplinary Final Warning and to withdraw the Chief Institutional Auditor's Report and the HR Report.

### COUNT TWO
### Violation of the Rehabilitation Act
### Injunctive Relief and Damages (Lieutenant Milam)

90.    The Rehabilitation Act of 1973 and Title VII of the Civil Rights Act of 1974 ("Acts") make it unlawful for an employer to discriminate against an employee because he has opposed an employment practice which violate the Acts.

91.    Lieutenant Milam had a good faith belief that the directive received from the Chief and Deputy Chief on May 9, 2019, and the direction by the Chief not to request a K9 were unlawful retaliation against Corporal Midkiff.

92.    Lieutenant Milam had a good faith belief that the investigation of Corporal Midkiff in contravention of Department GO 203 proceeded with the Chief and Deputy's Chief approval and was motivated by their expressed intent to make Corporal Midkiff's work environment difficult and subject Midkiff to heightened scrutiny..

93.    Lieutenant Milam's report to OIE constituted protected activity under the Rehabilitation Acts.

94.    By not following the directive of the Chief and Deputy Chief, Lieutenant Milam engaged in protected oppositional activity under the Acts.

95.    The Defendant's secret investigation by the HR Employee targeting Lieutenant Milam, crafting contrived and false charges against Lieutenant Milam, and issuing a Disciplinary Final Warning to Lieutenant Milam is retaliation made unlawful by the Acts.

96.    The Disciplinary Final Warning constitutes a substantial and serious stain on Lieutenant Milam's employment record damaging, and eliminating opportunities for advancement, pay increases and job assignments.  The purpose and effect of the Disciplinary Final Warning is to position Lieutenant Milam at risk of discharge at the Defendant's discretion should he commit a minor infraction going forward.  The Disciplinary Final Warning impairs Lieutenant Milam's marketability should he seek employment outside the KSU Department of Public Safety.

97.    The Defendant is liable to Lieutenant Milam for damages resulting from the retaliation including the emotional distress inflicted by damaging his 24-year record of service to KSU.

98.     The Defendant should be required to remove from Lieutenant Milam's personnel records the Disciplinary Final Warning and withdraw the Chief Institutional Auditor's Report and the HR Report.

**COUNT THREE**
**Violation of the Rehabilitation Act**
**Injunctive Relief and Damages (Corporal Midkiff)**

99.     The Rehabilitation Act makes it unlawful for an employer to discriminate and unlawful to retaliate against an employee who exercises his rights under the Rehabilitation Act, because he has opposed an employment practice which violates the Rehabilitation Act, or because who has filed a charge of discrimination.

100.    The acts complained of in this Complaint which include the Chief and Deputy Chief meeting with the Special Operations Unit on May 9, 2019 and directing them to write him up, the Chief's direction to Captain Murphy not to request a K9, conducting an unauthorized investigation which circumvented GO 203 in order to subject Corporal Midkiff to an extreme level of scrutiny, removing the OIE from the monitoring and enforcement of the Agreement, banning Corporal Midkiff from campus for four months and directing Captain Murphy and Lieutenant Milam not to tell anyone where he was or what happened to him, mischaracterizing the July comment, issuing the letter of reprimand based upon an unauthorized investigation in violation of GO 203, refusing to consider evidence proving that a mental

examination was not needed or justified, constitute discrimination and retaliation against Midkiff for exercising his rights under and opposing in good faith employment practices made unlawful by the Rehabilitation Act.

101.   Because of the discrimination and retaliation, Corporal Midkiff was unable to work overtime for special events occurring during the months of August through November 2019, causing him to lose more than $10,000 in overtime compensation.

102.   The purpose and effect of the Chief and Deputy Chief's meeting on May 9, 2019 was to make Corporal Midkiff's work environment hostile.

103.   Corporal Midkiff suffered emotional distress as the result of the retaliation which included sleep deprivation and inability to function effectively at work. He has suffered damages including lost wages and emotional distress.

104.   The Defendant should be required to remove from Corporal Midkiff's personnel records the letter of reprimand and withdraw the Chief Institutional Auditor's Report and the HR Report.  All references to Corporal Midkiff being a threat to safety and the fitness for duty examination should be purged.

## COUNT FOUR
### Violation of the Section 504 - Unlawful Psychological Examination
### Injunctive Relief and Damages (Corporal Midkiff)

105.   Defendant's conduct as described in this Complaint and in particular paragraphs 61 -71 constitutes a violation of the Rehabilitation Act of 1973 and 29 C.F.R. Part 1630.

106.   It was unlawful for the Defendant to require Corporal Midkiff to submit to a psychological evaluation which was not consistent with business necessity.

107.   Corporal Midkiff is an individual with a disability and a record of disability under 29 U.S.C. § 704. It was unlawful for the Defendant to conclude without inquiry that Corporal Midkiff's sleep deprivation caused by PTSD made him a risk to himself and to the safety of the community.

108.   The Defendant required Corporal Midkiff to submit to the psychological examination under concerns of workplace violence to create a record of derogatory information on Corporal Midkiff in retaliation for filing submitting his June 13, 2019 complaint to the OIE.

## **Demand for Jury Trial**

109.       Plaintiffs demand trial by jury for all issues so triable.

**Requests for Relief**

WHEREFORE, Plaintiffs request that this Court:

a) Grant judgment in favor of the Plaintiffs  and declare that Defendant has violated Section 504 of the Rehabilitation Act of 1973 and Title VII of the Civil Rights Act of 1964;

b) require KSU to set aside the findings in the reports, set aside the disciplinary warnings and reprimand, destroy the fitness for duty report submitted on Midkiff, and eliminate any reference to same in KSU records;

c) award Plaintiffs nominal, compensatory, and other damages including damages for pain and suffering;

d) award lost wages with interest to Plaintiff Midkiff;

e) award court costs and attorneys' fees;

f) enjoin the Defendant from interfering with the rights and privileges provided to Corporal Midkiff in the Informal Settlement Agreement; and

g) grant such other relief as the Court deems just and equitable.

This 4th day of May 2020.

Respectfully submitted,

/s/ Keith B. Romich
State Bar No. 613970
Attorney for Plaintiffs Russell Midkiff,
Robert Milam And Timothy Murphy

3814 Wesley Chapel Road
Marietta, GA 30062
Telephone: (404) 218-6755
Facsimile:   (404) 249-8177
Email:   kromich@romichlaw.com